IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| AMANDA J. CORNELL, | ) | 8:14CV61 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

In this social security appeal, plaintiff Amanda J. Cornell ("Cornell") argues that the Commissioner of Social Security committed reversible error in determining that she is not entitled to supplemental security income. For the reasons discussed below, the Commissioner's decision is affirmed.

## I.  BACKGROUND

On December 22, 2008, Cornell protectively filed her application for supplemental security income. (Tr. 32, 400.) Cornell's claims were denied initially and on reconsideration. On August 6, 2012, an administrative law judge ("ALJ") issued a decision finding that Cornell was not disabled under section 1614(a)(3)(A) of the Social Security Act. (Tr. 183-94.) However, Cornell appealed and the Appeals Council remanded the case back to the ALJ to further evaluate Cornell's mental impairments. (Tr. 202-05.)

On remand, the ALJ held a hearing with a medical expert, Dr. Thomas England ("England"), and a vocational expert, Theresa Wolfert ("Wolfert"). (Tr. 42.) On August 9, 2012, the ALJ again concluded that Cornell was not disabled under section 1614(a)(3)(A) of the Social Security Act. In his decision, the ALJ followed the five-

step sequential analysis prescribed by the Social Security Regulations to evaluate Cornell's claims.[1]  *See* 20 C.F.R. § 416.920(a).  The ALJ found as follows:

1.  The claimant has not engaged in substantial gainful activity since December 22, 2008, the application date (20 CFR 416.920(b) and 416.971 et seq.).

2.  The claimant has the following severe impairments: bipolar disorder; personality disorder, not otherwise specified; history of post-traumatic stress disorder (PTSD); history of alcohol and marijuana abuse; history of lower back pain; and obesity (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d)).

---

[1]The Social Security Administration uses a five-step process to determine whether a claimant is disabled.  These steps are described as follows:

At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 416.967(b), as she can lift up to 20 pounds occasionally and 10 pounds frequently, sit for 6 hours and stand for 6 hours and with normal breaks complete normal workday. However, due to her conduct, she would need direction to perform even simple tasks at home and in the work setting with supervisors and peers. She would have to be told to do simple repetitive tasks and could not do simple 1, 2, or 3 step procedures. She would have to be redirected on a consistent basis and would not have the ability to continue her concentration because of the interference from her mental symptoms.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on November 29, 1988 and was 18 years old, which is defined as a younger individual age 18-49, on the alleged onset date (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, based on all of the impairments, including the substance use disorder, there are no jobs that exist in significant numbers in the national economy that claimant can perform (20 CFR 416.960(c) and 416.966).

10.     If the claimant stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.

11.   If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d)).

12.   If the claimant stopped the substance use, the claimant would have the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), as she can lift up to 20 pounds occasionally and 10 pounds frequently, sit for 6 hours and stand for 6 hours and with normal breaks complete an 8-hour workday, and she has unlimited use of the extremities.  She would be able to do normal activities of daily living, such as take care of herself and do things around the house.  Socially, she would have a difficulty in selecting good friends as opposed to bad friends but would have the ability to recognize the problems she is getting into by the type of associations she is making and her temper outbursts and agitation symptoms would not interfere in the workplace with peers and supervisors so that she would be able to behave herself in such a manner to consistently hold a job; perform simple 1, 2, or 3 step procedures; understand and follow simple instructions; and satisfactorily work and complete an 8-hour work day and 40-hour work week.

13.   As indicated above, the claimant does not have past relevant work (20 CFR 416.965).

14.   As indicated above, transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

15.   If the claimant stopped the substance use, considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform (20 CFR 416.960(c) and 416.966).

16.   The substance use disorder is a contributing factor material to the determination of disability because the claimant would not be

> disabled if she stopped the substance use (20 CFR 416.920(g) and
> 416.935).  Because the substance use disorder is a contributing
> factor material to the determination of disability, the claimant has
> not been disabled within the meaning of the Social Security Act
> at any time from the date the application was filed through the
> date of this decision.

(Tr. 17-32.)  After the ALJ issued his decision, Cornell filed a request for a review with the Appeals Council.  (Tr. 9-10.)  On January 29, 2014, the Appeals Council denied Cornell's request for review.  (Tr. 1-6.)  Thus, the ALJ's decision stands as the final decision of the Commissioner of Social Security.

## II.  STANDARD OF REVIEW

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole.  *Hogan v. Apfel*, 239 F.3d 958, 960 (8th Cir. 2001).  "Substantial evidence" is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.  *Id.* at 960-61; *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000).  Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome.  *See Moad v. Massanari*, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result.  *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992).  Issues of law are reviewed de novo. *Olson v. Apfel*, 170 F.3d 820, 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n.2 (8th Cir. 1995).

5

# III.  DISCUSSION

## A.    Relevant Medical History and Opinions

On January 24, 2008, Cornell visited George Young, M.D. ("Young"), a contract psychiatrist for Action Partnership Inc. (formerly GOCA).  (Tr. 1111.) Young noted that Cornell had "a long history of substance abuse and defiance." (*Id.*) Young found Cornell to be cooperative and nicely dressed, but concluded that she possessed a below average fund of general information.  (Tr. 1113.)  She did not appear to be depressed, her eye contact was "all right," and her associations of speech were normal.  (*Id.*)  Young diagnosed Cornell with bipolar disorder, post traumatic stress disorder, and a history of marijuana and alcohol abuse, minimal, in remission. (*Id.*)

On February 2, 2008, Lee Branham, PhD ("Branham"), completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique of Cornell.  (Tr. 1114-30)  In the Assessment and Review, Branham concluded Cornell was moderately limited in a number of areas, but that her condition would not markedly limit her work abilities.  (*Id.*)

On March 12, 2008, Cornell went to Douglas County Community Mental Health Center ("DCH") because she wanted "to get general assistance."  (Tr. 1402.) She reported that she used marijuana once a week and that she had been previously diagnosed with bipolar disorder.  (Tr. 1402.)

On November 14, 2008, Cornell admitted herself to DCH for "increased mania and irritability."  (Tr. 1153.)  Cornell indicated she had been off of her medications for two months and admitted increased irritability, distractibility, racing thoughts, decreased sleep, and increased promiscuity.  (*Id.*)  After a successful treatment regimen, staff psychiatrist Tenycia Shepherd, M.D. ("Shepherd"), discharged Cornell to Lasting Hope Recovery Center.  (Tr. 1153-1154.)  In describing Cornell's discharge

6

condition, Shepherd noted Cornell had the capacity to follow through with her treatment plan, and she was able to seek medical substance use or mental health treatment as needed. (Tr. 1154.) Shepherd opined that Cornell's mental functioning showed she had a good mood, a blunted affect, spontaneous speech, goal-directed thought processes, normal thought content, a clear sensorium, full cognition, intact recent and remote memory, and an adequate fund of knowledge. (*Id.*) However, Cornell's insight and judgment were "fair to poor," and Shepherd's prognosis was "guarded." (*Id.*)

On January 8, 2009, Community Alliance ("CA") staff performed an assessment of Cornell's "Consumer Level of Functioning." (Tr. 542.) During the assessment Cornell reported that she had anger management issues, but no anxiety. (*Id.*) She admitted to smoking marijuana once a week, and that she occasionally informed doctors that she wanted to quit smoking marijuana, but could only quit for 2-3 days. (Tr. 543.) The assessment revealed that Cornell maintained personal hygiene, did laundry, volunteered for cleaning chores, enjoyed cooking, could follow a cooking recipe, used appliances, could shop for groceries without assistance, could use public transportation to run errands, and was resourceful in contacting services as needed. (Tr. 545-49.)

On March 10, 2009, Clinical Psychologist A. James Fix, Ph.D. ("Fix"), examined Cornell. (Tr. 1292-97.) During the exam, Cornell was very clean, well-groomed, and wore makeup appropriately. (Tr. 1292.) Cornell reported that she consumed alcohol occasionally and that she last used marijuana "three years ago." (Tr. 1294.) Fix reported that Cornell's mental status examination showed she had a strong initial presentation, was alert and responsive, exhibited appropriate behavior and had a positive attitude. (*Id.*) Cornell's speech was clear and well formed, her responses were relevant and coherent, she was fully oriented, and she had a good fund of knowledge. (Tr. 1295.) She correctly performed simple mathematical calculations, she had good memory testing, and she accomplished five serial sevens within 30 seconds, all of which suggested "a strong average range intellectual capacity . . . with

7

no evidence of emotional interference with her thinking." (*Id*.) Fix opined that Cornell seemed generally stabilized and that her prognosis was positive. (Tr. 1296.)

On May 7, 2009, Cornell told Brune that she did not take her prescribed medications when she drinks alcohol or uses drugs. (Tr. 1327-28).

On May 21, 2009, Cornell reported to the social workers at CA that she smokes marijuana three times a week and was "banned and barred" from a peer's apartment after being caught smoking marijuana on the patio. (Tr. 560.) That same day, CA staff brought Cornell to visit her attorney for her social security appeal. (*Id*.) CA staff noted that Cornell's attorney advised her that if she continued to use drugs and alcohol, her case would be dropped. (*Id*.)

On July 6, 2009, Jennifer Bruning Brown, PhD ("Brown"), completed a Psychiatric Review Technique of Cornell. (Tr. 1341-57.) Brown found that Cornell had only moderate limitations in functioning. (*Id*.)

On July 7, 2009, Brune completed a Mental/Emotional Capacity checklist for Cornell's attorney. (Tr. 1370-72.) On the checklist, Brune indicated that Cornell had mostly "poor" abilities and a few "fair" abilities. (*Id*.) He did not provide any reasoning or analysis for his selections. (*Id*.) That same day he also completed a Psychiatric Evaluation form for Affective Disorders. (Tr. 1362-69.) On the form he indicated that Cornell's symptoms would exist whether or not she used alcohol and/or drugs. (Tr. 1369.) This form was also signed by a supervising physician. (*Id*.)

On July 21, 2009, Cornell was admitted to DCH because she made "homicidal ideations" toward a man that pulled a toy gun on her and her new boyfriend. (Tr. 1382.) Mary Jo Hanigan, M.D. ("Hanigan"), a DCH staff psychiatrist, reported that she had collaborative information that suggested Cornell "had been recently using" illicit drugs. (Tr. 1382-84.) Hanigan's treatment notes indicate that Cornell had previously received chemical dependency/addiction treatment at GOCA. (Tr. 1385.)

8

Hannigan's Axis I notes indicate "BAD I R/O THC abuse," but her discharge plan for Cornell included chemical dependency treatment ("CD tx").  (Tr. 1386-87.)  On August 11, 2009, Cornell requested drug and alcohol support from CA staff.  (Tr. 584.)

On October 26, 2009, Cornell reported to CA staff that she had enrolled at Metro Tech College, applied for financial aid, and started working at Omaha Steaks. (Tr. 578.)

On March 23, 2010, Cornell visited Brune.  (Tr. 1380.)  At the time, she was 18 weeks pregnant and attending school at Kaplan part-time.  (*Id*.)  Although she had run out of her medication a week earlier, Cornell reported her sleep, activities of daily living, housing, mood and daily routine all remained stable.   (*Id*.)  Her dress, grooming, eye contact, speech and psychomotor activities were all within normal limits; her thought processes were goal-directed; she had no evidence of thought disturbances; she was fully oriented; her sensorium was clear; she had fair attention, concentration, and impulse control; and limited insight and judgment.  (Tr. 1380-81.)

On May 11, 2010, Cornell follow up with Brune.  (Tr. 1378.)  During the appointment, Cornell reported that she kept forgetting to take her medications and had been "off all her psychotropic medications for over a month."  (*Id*.)  Brune noted that Cornell's mental status examination showed appropriate and casual dress, hygiene and grooming; she maintained direct eye contact; she had normal psychomotor activity; she had spontaneous speech and tangential thought processes; there were no thought disturbances; her sensorium was clear; she was alert and fully oriented; she had fair impulse control and limited insight and judgment.  (*Id*.)

In June and July 2010, Cornell visited Brune twice and he reported findings similar to Cornell's May 11, 2010, visit.  (Tr. 1376, 1487.)  However, Brune also noted that her insight and judgment were improving from baseline.  (Tr. 1376.)

On July 19, 2010, Burne responded to a letter from Cornell's attorney. (Tr. 1410-11.) In the response, Brune indicated that the symptoms he described in his evaluations would exist in the same degree of severity, whether or not Cornell used alcohol or drugs. (*Id*.) This response was also signed by a supervising physician. (*Id*.)

On August 27, 2010, Cornell gave birth. (Tr. 1475.) However, 12 days later she ended up at DCH for noncompliance with her medications, self-diagnosed post-partum depression, and suicidal ideations. (Tr. 1471-72, 1475, 1478.) While at DCH, Cornell was restarted on her outpatient medication and was discharged after two days. (Tr. 1477-78.) In describing Cornell's discharge condition, Shepherd noted that Cornell was capable of seeking medical, substance use or mental health treatment as needed; her mood was euthymic; affect was full; speech was spontaneous; thought processes were goal directed; thought content was normal; sensorium was clear; cognition was full; recent and remote memory were intact; her fund of knowledge was adequate; and her insight and judgment were fair to poor. (Tr. 1477.) Cornell's blood screen during her stay at DCH was negative for drugs. (Tr. 1484.)

Prior to her discharge, Cornell was notified that upon her admission to DCH, and due to a concern for her newborn daughter's welfare, DCH staff had contacted Children Protective Services ("CPS"). (Tr. 1477.) However, shortly after her discharge, Cornell left her daughter with her boyfriend and he threatened to kill the child. (Tr. 1463, 1465.) During the course of these threats, the police shot and killed Cornell's boyfriend and CPS took custody of Cornell's daughter. (*Id*.)

On September 13, 2010, Cornell visited Brune and asked for her records to give to CPS to show them that she was a "good mother." (Tr. 1465.) During this visit, and subsequent visits on September 16, 2010, and October 6, 2010, Brune reported that Cornell's mental status examinations showed she had normal general appearance, behavior and attitude; normal psychomotor activity; direct eye contact; spontaneous speech; tangential and goal-directed thought processes; no thought disturbances; her

sensorium was clear; she was alert and fully oriented; she had fair attention and concentration; but limited to poor insight and judgment. (Tr. 1461-65.)

On October 20, 2010, Cornell visited psychologist Daniel L. Fudge, Ph.D. ("Fudge"). (Tr. 1423-1426.) In her pretreatment self-assessment, Cornell denied current use of marijuana. (Tr. 1431.) Fudge's clinical findings indicated that Cornell had good hygiene, appropriate dress, no motor coordination problems, appropriate speech, good articulation, adequate vocabulary, a good fund of knowledge, and good abstract thought. (Tr. 1423.) Cornell was cooperative, fully oriented, and understood simple proverbs. (*Id*.) Cornell's intellectual ability appeared average, she performed simple calculations, counted backwards from ten, and her responses were coherent and easy to understand. (*Id*.) If she could have three wishes, she would get her daughter back, have her daughter home, and get a nursing degree. (*Id*.) Fudge reported that Cornell's thoughts appeared organized and clear, with no evidence of rambling, flight of ideas, loose associations, or racing thoughts. (*Id*.) Cornell disclosed that she was interested in mental health treatment because she wanted things to improve so she could get her daughter back from CPS. (Tr. 1424.)

On November 30, 2010, Cornell visited Brune for a psychiatric evaluation. (Tr. 1434.) Cornell had been off her medications for at least two weeks "for no specific reason." (Tr. 1434.) Brune pointed out that Cornell had "a long history of alcohol and marijuana abuse" and "few formal treatment programs," but that she denied all use of marijuana and alcohol at this time. (Tr. 1435.) Brune's examination showed Cornell was adequately dressed to the season, her grooming was appropriate, she maintained indirect eye contact, and her psychomotor was normal. (*Id*.) She was alert and fully oriented, her attention and concentration were adequate, she had intact memory and a good fund of knowledge. (Tr. 1436.) However, Brune indicated that she was unwilling to complete serial sevens, her judgment and impulse control were poor, and her estimated IQ was in the below-average to average range. (*Id*.) The pharmacy at DCH confirmed that Cornell had not been compliant with her medications. (Tr. 1448.)

11

On January 18, 2011, Cornell visited Fudge for a psychological evaluation and parenting assessment.   (Tr. 1440.)   According to his interview, behavioral observations, standardized tests, and review of records, Fudge concluded that Cornell met the diagnostic criteria for Adjustment Disorder with Anxiety and Depressed Mood due to her reports and her children being removed from her care.  (Tr. 1444.)  Fudge noted that Cornell had additionally been diagnosed with Bipolar I Disorder.  (*Id*.) Fudge found Cornell to have low average intelligence and therefore, she should be able to make appropriate decisions regarding life and parenting strategies.  (*Id*.)  He stated she "should have no difficulty acquiring skills and knowledge regarding parenting practices."  (*Id*.)  Fudge recommended that Cornell attend parenting classes and individual and family therapy.  (Tr. 1444-45.)  As long as she made progress, her visitations with her children should be transitioned from supervised to semi-supervised, and then unsupervised.  (*Id*.)  Eventually, the children should be transitioned back into Cornell's care.  (Tr. 1445.)

On February 8, 2011, Cornell was admitted to DCH with complaints of depression, suicidal ideations, feelings of hopelessness and worthlessness. (Tr. 1525.) Cornell was dealing with "significant stresses," including the upcoming court date regarding custody of her daughter.  (*Id*.)   Although she denied marijuana use, Cornell's lab drug screen during her stay was positive for marijuana.  (Tr. 1525, 1541.) Sidney A. Kauzlarich, M.D. ("Kauzlarich"), a DCH staff psychiatrist, reported that after Cornell was placed on her medications, her mental functioning improved and she could be discharged.  (Tr. 1525-26.)  Kauzlarich opined that Cornell's prognosis was pretty poor given her poor insight into illness, history of noncompliance, and her character disorder.  (Tr. 1526.)  She also stated that Cornell's "continued drug use interferes with a good prognosis."  (*Id*.)

On February 8, 2011, and in contrast to Kauzlarich's conclusion that Cornell's drug use interfered with a good prognosis, Brune responded to a letter from Cornell's attorney and stated that Cornell's symptoms, as described in his evaluations, would

exist in the same degree of severity whether or not she used alcohol or drugs. (Tr. 1520-21.) This response was signed by a supervising physician. (*Id*.)

On November 15, 2011, CA noted that Cornell and her mother had been debating whether to call the police regarding abuse from her deceased boyfriend's cousin. (Tr. 1642.) CA staff discussed the event with Cornell and noted that Cornell's mother stated Cornell had gone over to the cousin's apartment with a friend to smoke marijuana. (*Id*.)

On November 16, 2011, Cornell visited Brune. (Tr. 1580.) Cornell reported that she had been off of her medications for two weeks and that she had recently been "smoking pot." (*Id*.) Brune's mental status examination notes showed Cornell's thought processes were slowed with poverty of thought, she had poor attention and concentration, and she had poor insight due, in part, to her "addictions." (*Id*.)

On December 12, 2011, CA staff arrived at Cornell's apartment for a weekly meeting to assist with the rescheduling of an appointment. (Tr. 1621.) Cornell was in an anxious mood, cursed, became irritated, and yelled at the people assisting her. (*Id*.) Cornell admitted to recent alcohol and cannabis use. (*Id*.) CA staff explained the hazards of mixing her mental health medications with alcohol and drugs. (*Id*.)

On December 20, 2011, Cornell attended a counseling session at DCH and acknowledged her use of marijuana and a history of using crack cocaine. (Tr. 1577.) During the session, Cornell had a blunted affect, minimal eye contact, and was depressed and anxious. (*Id*.) The therapy notes included a diagnosis of "cannabis abuse." (*Id*.) Cornell's treatment plan included drug, alcohol, and chemical dependency education. (*Id*.)

On January 17, 2012, CA staff picked Cornell up and transported her to her Day Rehabilitation Program for a weekly meeting. (Tr. 1618.) CA staff noted that Cornell stated that "getting high calms her nerves." (*Id*.)

13

On January 26, 2012, Cornell attended a counseling session at DCH and DCH staff diagnosed her with cannabis abuse. (Tr. 1575.) Cornell reported sleeping all the time and being irritable and depressed. (*Id*.) She had minimum eye contact, and her grooming and hygiene were poor. (*Id*.)

On February 9, 2012, Cornell visited Brune and reported that she had been off her medications "for a while." (Tr. 1574.) She was disheveled, had slow psychomotor activity and poverty of thought, her mood was flat and constricted, she laughed inappropriately, and her attention and concentration were poor. (*Id*.) Her blood test was positive for marijuana. (Tr. 1570.)

On March 8, 2012, Cornell visited Brune and reported that she was continuing to use marijuana. (Tr. 1569.) She had increased paranoia and irritability, her psychomotor and thought processes were slowed, and she had poor attention and concentration. (*Id*.)

On April 5, 2012, Cornell visited Brune and reported that she was continuing to use cannabis "once a month." (Tr. 1671.) On this occasion, Brune found that Cornell's psychomotor was within normal limits, but her insight and judgment were limited and "limited R/T [related to] continued substance abuse." (*Id*.) Brune discussed with Cornell the risks of her continued illegal substance use with her prescription medications and the potential for symptom exacerbation. (Tr. 1565, 1568.) On April 9, 2012, Cornell tested positive for marijuana. (Tr. 1562, 1672.)

On August 10, 2012, Cornell's attorney interviewed Brune. (Tr. 654-59.) During the interview, Brune stated that Cornell's depression and mood instability are aggravated by her substance use, and that Cornell's substance use complicates the process of determining whether there would be a difference in functioning with or without marijuana use. (Tr. 654-65.) However, he thought that overall, her level of impairment would be the same because she remained impaired during periods of sobriety and abstinence. (*Id*.) Brune based this opinion on his "clinical experience"

14

with Cornell being "very open, very forthcoming with her use of illegal substances," and being forthcoming when "she hasn't been using." (Tr. 654, 656.) Brune stated that he had "no reason not to believe" Cornell's self reports. (Tr. 656.)

On April 30, 2012, Burne responded to a letter from Cornell's attorney. (Tr. 1603-04.) In the response, Brune indicated that the symptoms he described in his evaluations would exist in the same degree of severity, whether or not Cornell used alcohol or drugs. (*Id*.) This response was also signed by a supervising physician. (*Id*.)

On July 11, 2012, Burne responded to a letter from Cornell's attorney. (Tr. 1704-05.) In the response, Brune indicated that the symptoms he described in his evaluations would exist in the same degree of severity, whether or not Cornell used alcohol or drugs. (*Id*.) This response was also signed by a supervising physician. (*Id*.)

## B.   Hearing Testimony

On April 27, 2011, the ALJ held a hearing regarding Cornell's application. (Tr. 134.) At the hearing, Cornell testified she stopped using all street drugs on May 21, 2009. (Tr. 138.) When asked about her positive drug screen in February 2011, Cornell stated that she didn't actually smoke marijuana, but was around it at a party and "it got in my system that way." (Tr. 139.)

Cornell said she could not work because of lack of energy and concentration. (Tr. 144.) Her typical day consists of going to CA, having a supervised visit with her daughter, watching television, interacting with her mother when she gets home, and washing the dishes. (Tr. 145-46.)

On July 26, 2012, after the Appeals Council sent Cornell's case back to the ALJ for further development with regard to Cornell's mental abilities, the ALJ held another

15

hearing. (Tr. 45.) During the hearing, Cornell testified that she was fired from Omaha Steaks after two weeks because of an anger outburst. (Tr. 48.) She indicated that Brune was treating her for her anger as well as voices that she hears as part of her bipolar disorder. (Tr. 52.) With regard to doing dishes and laundry, she indicated that her mom needed to ask her to do them. (Tr. 56.) She said she could sweep and mop, ride the bus to get around town, and she enjoys listening to music. (Tr. 55-56.) When asked about her marijuana use, she said that she started in 2008 and used it about once a month until 2009, and then every month since then. (Tr. 73.) She indicated that she finally quit in May 2012. (*Id*.) She said that when she gets really depressed, she tells her doctor, who will usually change her medication to "fix the problem before it gets worse." (Tr. 73-74.)

At the July 26, 2012, hearing Clinical Psychologist Thomas England, Ph.D. ("England"), testified as a medical expert. (Tr. 93-110.) England testified that Cornell's records do not show a consistent diagnosis of schizoaffective disorder or post-traumatic stress disorder. (Tr. 95-97.) However, there was evidence of bipolar mood disorder and personality disorder traits. (Tr. 96, 97-98.) England then noted that Cornell's 12.09 condition (i.e., substance use) "is especially problematic." (Tr. 98.) He said that although Brune did not make the diagnosis, there was clearly evidence in the record of marijuana use, "extensive" citations in the record, and a doctor had diagnosed marijuana abuse. (Tr. 98, 1575.)

England testified that Cornell chooses to use marijuana instead of taking her medications. (Tr. 99.) England opined that Cornell's substance use was a contributing factor to her difficulties in maintaining compliance with medication, the effectiveness of treatment, and her continued associations in high-risk relationships. (*Id*.)

England concluded that evidence in the record shows that Cornell's mental condition would improve if she remained sober and complied with treatment. (Tr. 99-100.) He noted that Cornell would still have some limitations, but she could perform

repetitive and simple work with less social contact. (Tr. 100.) England opined that with marijuana use, Cornell would have moderate to marked limitations in activities and social functioning, but with abstinence and compliance, they would be in only the moderate range. (Tr. 101.) With regard to concentration, England stated Cornell would be limited to simple one-, two-, or three-step repetitive tasks if she abstained and complied with her treatment. (Tr. 101.)

In response to questioning from Cornell's counsel, England noted that DCH did not diagnose her with drug addiction, but they did diagnose drug abuse. (Tr. 103-04.) England also clarified that the characteristics of Cornell's marijuana abuse or dependency overlap with the characteristics of her personality disorder. (Tr. 106.)

## C.   Cornell's Arguments on Appeal

In her appeal brief, Cornell argues that the ALJ's opinion is not supported by substantial evidence because (1) the record contains no diagnosis of "Substance Use Disorder," and therefore, the ALJ should not have performed a Drug Abuse and Alcoholism ("DAA") analysis, and (2) DAA is not "material" to her disability finding. (Filing 17 at CM/ECF pp. 19-30; Filing 19 at CM/ECF pp. 3-10.) The Commissioner contends that the ALJ's decision is supported by substantial evidence. (Filing 18 at CM/ECF pp. 19-32.) I agree with the Commissioner.

### 1.   *DAA Analysis*

An individual is not considered disabled if substance abuse is "a contributing factor material to the Commissioner's determination that the individual is disabled." *Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010) (quotations and citations omitted). In the case of substance abuse, an ALJ must first determine if a claimant's symptoms, regardless of cause, constitute disability. *Id*. "If the ALJ finds a disability and evidence of substance abuse, the next step is to determine whether those disabilities would exist in the absence of the substance abuse." *Id*. Throughout this

17

process, the burden remains on the claimant "to prove [substance abuse] is not a contributing factor." *Id.*

Here, the ALJ concluded Cornell has the following severe impairments: "bipolar disorder; personality disorder, not otherwise specified; history of post-traumatic stress disorder (PTSD); *history of alcohol and marijuana abuse*; history of lower back pain; and obesity (20 CFR 416.920(c))." (Tr. 17 (emphasis added).) The ALJ considered all of these impairments, "including the *substance use disorder*," and concluded there were "no jobs that exist in significant numbers in the national economy" that Cornell could perform. (Tr. 24 (emphasis added).) The ALJ then went on to analyze whether Cornell would be impaired if she stopped using marijuana. (Tr. 24-31.) He concluded that the substance use disorder was a contributing factor material to the determination of disability because Cornell "would not be disabled if she stopped the substance use." (Tr. 32.)

Cornell argues that ALJ should not have analyzed whether her substance use was material to her disability because her medical records do not establish that she has a "Substance Use Disorder" as defined by the Commissioner. (Filing 17 at CM/ECF pp. 19-22.) In support of her argument, Cornell cites to Social Security Ruling 13-2p, which describes how the Social Security Administration defines the term DAA. (*Id.*) SSR 13-2p (Feb. 20, 2013). Under this Ruling, DAA is defined as "Substance Dependence or Substance Abuse as defined in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) published by the American Psychiatric Association." SSR 13-2p. "In general, the DSM defines Substance Use Disorders as maladaptive patterns of substance use that lead to clinically significant impairment or distress." *Id.* To establish the existence of DAA there must be "objective medical evidence–that is, signs, symptoms, and laboratory findings–from an acceptable medical source that supports a finding that a claimant has DAA." *Id.* In addition, "information from 'other' sources may be considered together with objective medical findings from a treating or nontreating acceptable medical source to document that the claimant has DAA." *Id.*

18

Cornell argues that admitting to the ALJ, CA staff, or her psychiatric providers that she uses marijuana, and even her "occasional positive drug screen," does not establish that she has a "Substance Use Disorder." (Filing 17 at CM/ECF p. 21-22.) She believes "the essential finding for conducting the DAA analysis never existed in this case." (*Id*. at 22.) Contrary to Cornell's argument, her medical record contains substantial evidence from acceptable medical sources, and "other" sources, sufficient for the ALJ to conclude that a DAA analysis was necessary.   Indeed, examples include, but are not limited to:

- March 12, 2008: Cornell reports to DCH that she uses marijuana once a week.  (Tr. 1402.)
- January 8, 2009: Cornell admits to smoking marijuna once a week, and that she occasionally informed doctors that she wanted to quit smoking marijuana, but could only quit for 2-3 days.  (Tr. 543.)
- May 7, 2009: Cornell told Brune that she did not take her prescribed medications when she drinks alcohol or uses drugs.  (Tr. 1327-28.)
- May 21, 2009: Cornell reported to social workers at CA that she smokes marijuana three times a week and was "banned and barred" from a peer's apartment after being caught smoking marijuana on the patio.  (Tr. 560.)
- July 22, 2009: Hanigan, a DCH staff psychiatrist, notes that collaborative information indicates Cornell "had been recently using" illicit drugs. Hanigan includes chemical dependency treatment in Cornell's discharge plans. (Tr. 1387.)
- August 11, 2009: Cornell requested drug and alcohol support from CA staff.  (Tr. 584.)
- November 30, 2010: Brune pointed out that Cornell had "a long history of alcohol and marijuana abuse" and "few formal treatment programs." (Tr. 1435.)
- February 8, 2011: Cornell's lab drug screen during her stay at DCH was positive for marijuana.  Kauzlarich, a DCH staff psychiatrist, states that Cornell's "continued drug use interferes with a good prognosis." (Tr. 1525, 1541.)

- November 15, 2011: Cornell is assaulted at her deceased boyfriend's cousin's house.  Cornell's mother discloses that Cornell had gone over to the cousin's apartment with a friend to smoke marijuana.  (Tr. 1642; *see also* Tr. 75-76.)
- November 16, 2011: Cornell reports to Brune that she had been recently "smoking pot."  (Tr. 1580.)
- December 12, 2011: Cornell admits to recent alcohol and cannabis use. CA staff explained the hazards of mixing her mental health medications with alcohol and drugs.  (Tr. 1621.)
- December 20, 2011: Cornell attended a counseling session at DCH and acknowledged her use of marijuana and a history of using crack cocaine.  The therapy notes included a diagnosis of "cannabis abuse," and her treatment plan included drug, alcohol, and chemical dependency education.  (Tr. 1577.)
- January 17, 2012: CA staff picked Cornell up and transported her to her Day Rehabilitation Program for a weekly meeting.  CA staff noted that Cornell stated "getting high calms her nerves."  (Tr. 1618.)
- January 26, 2012: Cornell attended a counseling session at DCH and DCH staff diagnosed her with cannabis abuse.  (Tr. 1575.)
- February 9, 2012: Cornell visited Brune and her blood test was positive for marijuana.  (Tr. 1570.)
- March 8, 2012: Cornell visited Brune and reported that she was continuing to use marijuana.  (Tr. 1569.)
- April 5, 2012: Cornell visited Brune and reported that she was continuing to use cannabis "once a month."  On this occasion, Brune found that Cornell's psychomotor was within normal limits, but her insight and judgment were "limited R/T [related to] continued substance abuse."  (Tr. 1671.)  Brune discussed the risks of Cornell's continued illegal substance use with her prescription medications and the potential for symptom exacerbation.  (Tr. 1565, 1568.)
- July 26, 2012: England noted that Cornell's 12.09 condition (i.e., substance use) "is especially problematic."  (Tr. 98.)  England clarifies that the characteristics of Cornell's marijuana abuse or dependency overlap with the characteristics of her personality disorder.  (Tr. 106.)

Accordingly, substantial evidence on the record as a whole supports the ALJ's decision to conduct a DAA analysis.

2.     *DAA Materiality*

Although substantial evidence on the record as a whole supports the ALJ's decision to conduct a DAA analysis, Cornell also argues that her marijuana use is not material to her disability.  (Filing 17 at CM/ECF pp. 24-30; Filing 19 at CM/ECF p. 6-11.)   In support of this argument, Cornell asserts that "all the treating medical sources at DCH . . . have said on multiple occasions that whether or not Plaintiff uses marijuana, her markedly impairing symptoms from bipolar disorder, anxiety disorder, and personality disorder would still exist."  (Filing 19 at CM/ECF p. 6; Tr. 634-35, 655-57, 1369, 1410, 1520, 1603, 1704.)   These treating source opinions are either those of Brune alone, or those drafted by Brune and then signed off on by a supervisory physician.  (Tr. 634-35, 655-57, 1369, 1410, 1520, 1603, 1704.) She argues that the question before the court "is not whether the ALJ has cited evidence in the record to support his conclusions, but whether the opinions of the treating sources are inconsistent with other substantial evidence in the record."  (Filing 17 at CM/ECF p. 30.)

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians."  *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted).  While "a treating physician's opinion is generally entitled to substantial weight, that opinion does not 'automatically control' in the face of other credible evidence on the record that detracts from that opinion."  *Heino v. Astrue*, 578 F.3d 873, 880 (8th Cir. 2009); *see also Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is given controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence").  Indeed, "[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a

21

treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (internal quotation marks omitted). However, "[w]hen an ALJ discounts a treating physician's opinion he should give 'good reasons' for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).

Here, the ALJ gave Brune's opinions, including those signed off on by supervisory physicians, "some weight." (Tr. 24, 30.) However, the ALJ discounted any statements that Cornell would have marked limitations even without the use of substances because such statements were inconsistent with the evidence and the overall record. (*Id.*) In discussing Brune's opinions, the ALJ stated that he discounted them because "[i]ndications of improvement are noted throughout the record during periods when the claimant abstains from drugs or alcohol use and adheres to medication and treatment recommendations." (Tr. 30.) To illustrate Cornell's improved condition in periods of abstinence, the ALJ's opinion discusses, among other things, Young's and Fix's opinions, as well as Cornell's improving condition during hospitalization and medication adherence. (Tr. 28-30, 1111-13, 1153-54, 1292-97; *see also* Tr. 1477-78, 1484 (describing plaintiff's discharge condition after medical adherence with a negative blood screen for cannabis).) The record also contains England's opinion that Cornell chooses to use marijuana instead of taking her medications and Cornell's statement to Brune that she did not take her prescribed medications when she drinks alcohol or uses drugs. (Tr. 99, 1327-28.) Where an impairment can be controlled by treatment or medication, it cannot be considered disabling. *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007).

The ALJ also discounted Brune's opinions because the "overall evidence shows the claimant has periods of symptom exacerbation leading to marked functional limitations when she uses substances but without use she is capable of simple unskilled work." (*Id.*) Indeed, Brune's own treatment notes indicate that Cornell's insight and judgment were "limited R/T [related to] continued substance abuse" and that her continued illegal substance use with her prescription medications had

potential for symptom exacerbation. (Tr. 1565, 1568.)  Brune's notes also show that when Cornell was using marijuana, she had slow psychomotor activity, poverty of thought, poor attention and concentration, and increased paranoia and irritability. (*See* Tr. 1570, 1574.)  Despite these notes, Brune repeatedly opined that the symptoms he described in his evaluations would exist with the same degree of severity, whether or not Cornell used alcohol or drugs.  (*See, e.g.*, Tr. 655-57, 1369, 1410, 1520, 1603, 1704.)  An ALJ may discount a treating physician's opinion when it is inconsistent with the physician's own treatment notes or other evidence.  *See Davidson v. Astrue, 501 F.3d 987, 990-91 (8th Cir. 2007)* (concluding ALJ properly discounted a treating physician's opinion that was inconsistent with his treatment notes).

Further, the ALJ found Cornell's self-reports of marijuana use less than credible, specifically stating that she "minimized her substance use or denied it completely," even when it was contrary to the overall evidence. (Tr. 19; *see also* Tr. 27.)  However, Brune's opinions were based on his "clinical experience" with Cornell being "very open, very forthcoming with her use of illegal substances," and being forthcoming when "she hasn't been using." (Tr. 654, 656.)  Brune stated that he had "no reason not to believe" Cornell's self reports.  (Tr. 656.)  An ALJ may consider inconsistencies in a claimant's statements to physicians about her own physical health and well-being in determining the credibility of those statements.  *See Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)*.  Moreover, an ALJ may find a physician's opinion less credible where it is based on a claimant's less than credible self-reports.  *See, e.g., McCoy v. Astrue, 648 F.3d 605, 617 (8th Cir. 2011)* (concluding substantial evidence supported an ALJ's decision to discount a physician's opinion that was based on the claimant's less than credible self-reported symptoms).  Notably, Cornell does not challenge the ALJ's findings regarding her credibility.

In short, I find that the ALJ's decision to discount Brune's opinions, including those signed off on by supervising physicians, is supported by substantial evidence on the record as a whole.

# IV.  CONCLUSION

For the reasons explained above, I find the ALJ's decision is supported by substantial evidence on the record as a whole and is not contrary to law.  With regard to the materiality of Cornell's marijuana use to her disability, there is certainly evidence in the record cutting both ways.  However, I may not reverse the ALJ's decision merely because substantial evidence supports a contrary outcome.  *See Moad, 260 F.3d at 890*.  Indeed, Cornell had the burden to show that she would still be disabled if she were to stop using marijuana, and the ALJ concluded, in an opinion supported by substantial evidence, that she failed to do so.  *See Vester v. Barnhart, 416 F.3d 886, 888 (8th Cir. 2005)* (in determining whether substance abuse is material, claimant has burden of showing that she would still be disabled if she were to stop using drugs and alcohol).

Accordingly,

IT IS ORDERED that the decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).  Final judgment will be entered by separate document.

DATED this 26th day of March, 2015.

BY THE COURT:

*Richard G. Kopf*
Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.